**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| THE AMERICAN CIVIL LIBERTIES UNION OF ILLINOIS, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:10-cv-05235 |
| v. | ) ) | Judge Conlon |
| ANITA ALVAREZ, Cook County State's Attorney, in her official capacity, | ) ) ) | |
| Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S
MOTION FOR A PRELIMINARY INJUNCTION**

**INTRODUCTION**

Plaintiff American Civil Liberties Union of Illinois (the "ACLU") currently monitors police conduct in public places, including at events where citizens exercise First Amendment rights, and it intends to enhance this program by using common audio and video recording equipment.  However, the Illinois Eavesdropping Act, 720 ILCS 5/14-1, *et seq.* (the "Act"), on its face clearly prohibits the ACLU's planned recording of public police conduct because the Act prohibits the recording of conversations, whether or not there is a reasonable expectation of privacy, without all-party consent.  Defendant Cook County State's Attorney currently enforces the Act in the precise circumstances in which ACLU seeks to record police officers.

Enforcement of the Act, as applied to the ACLU's planned conduct, violates the First Amendment.  It deters the ACLU from recording information, disseminating it to others, and using it to petition government.  Thus, the ACLU seeks a preliminary injunction prohibiting defendant from enforcing the Act as applied to the ACLU's audio recording of police officers, without the consent of the officers, when: (1) the officers are performing their public duties; (2) the officers are in public places; (3) the officers are speaking at a volume audible to the unassisted human ear; and (4) the manner of recording is otherwise lawful.

## BACKGROUND

I.    **THE ILLINOIS EAVESDROPPING ACT**

    **A.    The Act and Its Legislative History**

The Act criminalizes the use of machines to record conversations, regardless of whether the conversations are private.  Specifically, the Act provides: "A person commits eavesdropping when he … [k]nowingly and intentionally uses an eavesdropping device for the purpose of hearing or recording all or any part of any conversation … unless he does so … with the consent of all of the parties to such conversation…." 720 ILCS 5/14-2(a)(1)(A).  The Act further defines "conversation" to mean "any oral communication between 2 or more persons *regardless of whether one or more of the parties intended their communication to be of a private nature under circumstances justifying that expectation*." 720 ILCS 5/14-1(d) (emphasis added).  A first offense is a class 4 felony, 720 ILCS 5/14-4(a), which is punishable by a sentence of imprisonment of one to three years, 730 ILCS 5/5-4.5-45.

In 1986, in *People v. Beardsley*, the Illinois Supreme Court held that under the prior version of the Act, the criminal offense of eavesdropping occurred only where the conversation at issue took place under "circumstances which entitle [the parties to a conversation] to believe that the conversation is *private* and cannot be heard by others who are acting in a lawful manner." 115 Ill. 2d 47, 53 (1986) (emphasis added).  The *Beardsley* case involved a motorist who recorded a police officer during a traffic stop. *Id.* at 49.  The Illinois Supreme Court concluded that the motorist did not violate the Act because the conversation was not private.

Eight years later, Illinois amended the Act with Public Act 88-677, also known as House Bill 356.  During floor debate, the Senate sponsor stated that the bill's purpose was "to reverse the Beardsley eavesdropping case." Ex. A, Tr. at 42.  The amendment adopted the current definition of "conversation," which expressly includes non-private communications.

    **B.    The Act's Exemptions for Law Enforcement**

The Act allows police to record their conversations with civilians (but not civilians to record their conversations with police) in a multitude of circumstances, including during any

"enforcement stop," a statutory term that includes *but is not limited to* a host of examples, such as "traffic stops," "pedestrian stops," and "requests for identification." 720 ILCS 5/14-3(h), (h-5), (h-10). Thus, the Act provides no meaningful restraint on uniformed, on-duty police recording practically all of their conversations with civilians.

The legislative purpose of these exemptions is to deter and detect police misconduct, and also to rebut false accusations of police misconduct. In 2009, Illinois amended the Act with Public Act 96-670, also known as House Bill 1057. This law amended exemption (h) to its current form, and added exemptions (h-5) and (h-10). The House sponsor stated:

> When there's audio, then there is no question as to what was said or what wasn't said and if someone is accused of doing something or saying something, this is the proof that they would have as a citizen also, not only for protection of law enforcement, but for the citizens to have the proof in hand as to what actually happened at that particular [moment].

Ex. B, Tr. at 83-84. *See also id.* at 85 (endorsing "protection for both" police and civilians).

## C. The Act Is a National Outlier

At least 45 states, the District of Columbia, and the federal government have a statute criminalizing the audio recording of certain in-person conversations. The federal government, D.C., and at least 38 states clearly exclude conversations where there is no reasonable expectation of privacy.[1] Four states (Alaska, Arkansas, Connecticut, and Montana) do not

---

[1] *See* 18 U.S.C. § 2510(2); D.C. Code § 23-541(2); Alabama Code § 13A-11-30(1); Arizona Stat. § 13-3001(8); California Pen. Code § 632(a) & (c); Colorado Stat. § 18-9-301(8); 11 Delaware Code § 2401(13); Florida Stat. § 934.02(2); Georgia Code § 16-11-62(1); Hawai'i Stat. § 803-41; Idaho Code § 18-6701(2); Iowa Code § 808B.1(8); Kansas Stat. 22-2514(2); Kentucky Stat. § 526.010, Commentary by the Kentucky Crime Commission and Legislative Research Commission; Louisiana Stat. § 15:1302(14); 15 Maine Stat. §§ 709(4)(B) & 709(5); Maryland Code, Cts. & Jud. Proc. §10-401(2)(i); Michigan Comp. Laws § 750.539a; Minnesota Stat. § 626A.01(4); Mississippi Code § 41-29-501(j); Missouri Stat. § 542.400(8); Nebraska Stat. § 86-283; Nevada Stat. § 179.440; New Hampshire Stat. 570-A:1; New Jersey Stat. § 2A:156A-2(b); New York Penal Law § 250.05, Commentary by Donnino, William C.; North Carolina Stat. § 15A-286(17); North Dakota Code § 12.1-15-04(5); Ohio Code § 2933.51(B); 13 Oklahoma Stat. § 176.2(12); 18 Pennsylvania Stat. § 5702; Rhode Island Gen. Laws § 12-5.1-1(10); South Carolina Code § 17-30-15(2); South Dakota Codified Laws § 23A-35A-1(10); Tennessee Code § 40-6-303(14); Texas Code of Criminal Procedure § 18.20(2); Utah Code 77-23a-3(13); Virginia Code § 19.2-61; Washington Rev. Code § 9.73.030(1)(b); West Virginia Code § 62-1D-2(h); Wisconsin Stat. 968.27(12); Wyoming Stat. 7-3-701(a)(xi).

specifically address this point.  Only three states—Illinois, Massachusetts, and Oregon—criminalize the audio recording of conversations where there is no reasonable expectation of privacy.  720 ILCS 5/14-1(d); Mass. Gen. Laws. 272 § 99(B); Oregon Stat. 165.540(1)(c).

### D. Prosecutions Under the Illinois Eavesdropping Act

Illinois State's Attorneys use the Act to prosecute civilians who have made audio recordings of police officers performing their public duties in public places.  Currently, the Cook County State's Attorney is prosecuting a civilian for doing so.  *See People v. Drew*, No. 10-cr-4601 (Cook County Circuit Ct.).  Drew moved to dismiss, arguing that this application of the Act violated the First Amendment.  Defendant Alvarez successfully opposed the motion.  Ex. C, Connell Decl., ¶ 12(c); Exs. C-1 & C-2 (defendant Alvarez's brief and oral argument).

At least three other State's Attorneys in Illinois have brought similar prosecutions.  *See* Connell Decl., ¶ 12(d).  *See also People v. Thompson*, No. 04-cf-1609 (6th Cir. Ct.) (Champaign County); *People v. Allison*, No. 09-cf-50 (2nd Cir. Ct.) (Crawford County); *People v. Parteet* (16th Cir. Ct.) (DeKalb County).

## II. THE ACLU AND ITS MONITORING PROGRAM

The ACLU is a non-profit, non-partisan, statewide organization with more than 20,000 members and supporters dedicated to protecting and expanding civil rights and civil liberties. Connell Decl., ¶ 2.  The ACLU regularly gathers, receives, and records information from numerous sources, including by observing events in public places.  *Id.*, ¶ 3.  The ACLU regularly publishes and disseminates such information to the general public through a wide variety of media.  *Id.*, ¶ 4.  Likewise, the ACLU presents such information to government bodies (including courts, legislatures, and administrative agencies) as part of the ACLU's efforts to petition the government for redress of grievances.  *Id.*, ¶ 4.  The ACLU itself engages in expressive activity in public, and regularly records such expressive activity.  *Id.*, ¶ 5.

The ACLU often monitors and observes police conduct in public, including at expressive activity.  *Id.*, ¶ 6.  Moreover, the ACLU often gathers, receives, and records information about

police practices, and then publishes that information, and uses that information to petition for redress of grievances. *Id.*, ¶ 7.

The ACLU intends to expand its monitoring of police activity in public by using common audio/video recording devices. *Id.*, ¶ 8. Specifically, the ACLU intends to audio record police officers, without the consent of the officers, when (1) the officers are performing their public duties; (2) the officers are in public places; (3) the officers are speaking at a volume audible to the unassisted human ear; and (4) the manner of recording is otherwise lawful (hereinafter, "the ACLU Program"). *Id.*, ¶ 8. Where appropriate, the ACLU intends to publish such recordings, and use them to petition for redress of grievances. *Id.*, ¶ 9. The ACLU's objective is to improve police practices, deter and detect any police misconduct, and create a record that might help resolve any testimonial disputes. *Id.*, ¶ 10.

The ACLU has not undertaken the ACLU Program because it fears prosecution by defendant under the Act. *Id.*, ¶¶ 11-12.[2] In June 2010, the ACLU was deterred by this fear of prosecution from making audio/video recordings of the City of Chicago's program of suspicionless searches of containers of persons present on certain public ways near the Chicago lakefront. *Id.*, ¶ 13. In the future, the ACLU would like to deploy the ACLU Program at public demonstrations, but it continues to be deterred by a fear of prosecution. *Id.*, ¶ 14.

## ARGUMENT

In order to obtain the preliminary injunction sought in its motion, the ACLU must demonstrate: (1) a reasonable likelihood of success on the merits; (2) no adequate remedy at law; (3) it will suffer irreparable harm which, absent injunctive relief, outweighs any irreparable harm to respondent if the injunction is granted; and (4) the injunction will not harm the public interest. *Goodman v. Ill. Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005).

---

[2] The ACLU itself has been injured – it has been deterred from implementing the ACLU Program – so the ACLU has organizational standing. *Warth v. Seldin*, 422 U.S. 490, 510-11 (1975). The ACLU need not implement its Program and suffer prosecution. It is sufficient that the ACLU has "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," and that "there exists a credible threat of prosecution." *Babbitt v. UFW*, 442 U.S. 289, 298 (1979).

The court uses a "sliding scale" approach, whereby "the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position." *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001).

I.      **THE ACLU WILL LIKELY SUCCEED ON THE MERITS OF ITS CLAIM**

"When a party seeks a preliminary injunction on the basis of a potential First Amendment violation, the likelihood of success on the merits will often be the determinative factor." *Joelner v. Vill. of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004). In this case, the ACLU has a substantial likelihood of success.

A.      **The First Amendment Right to Gather, Receive, and Record Information**

The U.S. Supreme Court has recognized a right to receive information in a variety of contexts. *See, e.g., Bd. of Educ. v. Pico*, 457 U.S. 853, 867 (1982) (plurality) ("the right to receive ideas is a necessary predicate to the *recipient's* meaningful exercise of his own rights of speech, press, and political freedom.") (emphasis in original); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 757 (1976) ("If there is a right to advertise, there is a reciprocal right to receive the advertising."); *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 390 (1969) ("It is the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences which is crucial."); *Griswold v. Connecticut*, 381 U.S. 479, 482-83 (1965) (plurality) ("The right of freedom of speech and the press includes not only the right to utter or to print, but the right to distribute, the right to receive, the right to read").[3] This right to receive information includes the right to observe expressive activity in public places. *See Pochoda v. Arpaio*, 2009 WL 1407543, at *4 (D. Ariz. May 20, 2009) (the ACLU's "observation of the demonstration" is protected, especially because the ACLU "was

---

[3] *See also Neinast v. Columbus Metro. Library*, 346 F.3d 585, 591 (6th Cir. 2003) ("This right to receive information 'includes the right to some level of access to a public library, the quintessential locus of the receipt of information.'"), *quoting Kreimer v. Bureau of Police*, 958 F.2d 1242, 1255 (3d Cir. 1992); *Conant v. Walters*, 309 F.3d 629, 643 (9th Cir. 2002) (Kozinski, J., concurring) ("the right to hear and the right to speak are flip sides of the same coin."); *Goldschmidt v. Coco*, 413 F. Supp. 2d 949, 953 (N.D. Ill. 2006) ("A prohibition against note-taking [in a courtroom] is not supportive of the policy favoring informed public discussion; on the contrary it may foster errors in public perception.").

there to safeguard or support the civil rights of the demonstrators"). The First Amendment right to receive information is thus intertwined with the First Amendment rights to express oneself, to disseminate information, and to petition the government.[4]

Numerous courts have held that the First Amendment right to gather and receive information includes the right to record information occurring in public places by taking photos and making video and audio recordings. *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) (finding a First Amendment right to "photograph or videotape police conduct" because "[t]he First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest"); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995) (recognizing a "First Amendment right to film matters of public interest"); *Dorfman v. Meiszner*, 430 F.2d 558, 562 (7th Cir. 1970) (striking down a ban on photography and radio and television broadcasts from the courthouse lobby and plaza, because it "would likewise prohibit effective photographing or broadcasting of a demonstration in the plaza if it concerned in any way judicial proceedings"); *Schnell v. City of Chicago*, 407 F.2d 1084, 1086 (7th Cir. 1969) (photography of police misconduct during the 1968 Democratic National Convention is "constitutionally protected activity"), *overruled on other grounds by City of Kenosha v. Bruno*, 412 U.S. 507 (1973); *Cuviello v. City of Stockton*, 2009 U.S. Dist. LEXIS 4896, at *77-78 (E.D. Cal. Jan. 23, 2009) (recording animal abuse by circus from city street); *Davis v. Stratton*, 575 F. Supp. 2d 410, 421 (N.D.N.Y. 2008) (videotaping one's own expressive activity in public places), *rev'd on other grounds,* 360 Fed. Appx. 182 (2d Cir. 2010); *Cuviello v. City of Oakland*, 2007 WL 2349325, at *3 (N.D. Cal. Aug. 15, 2007) (plaintiffs' "attempt to film alleged animal abuse previously was shared with news

---

[4] *See, e.g., United Mine Workers of America v. Illinois State Bar Ass'n*, 389 U.S. 217, 222 (1967) ("We start with the premise that the rights to assemble peaceably and to petition for a redress or grievances are among the most precious of the liberties safeguarded by the Bill of Rights. These rights, moreover, are intimately connected both in origin and in purpose, with the other First Amendment rights of free speech and free press."); *In re Primus*, 436 U.S. 412, 431 (1978) (protecting the intertwined freedoms of "political expression and association,"and of "communicating useful information to the public"); *United States v. Grace*, 461 U.S. 171, 176-77 (1983) (protecting freedom of expression in public places).

media and has generated public interest…. It constitutes free speech under the First Amendment."); *Connell v. Town of Hudson*, 733 F. Supp. 465, 468 (D.N.H. 1990) (photography of a car accident); *Lambert v. Polk County*, 723 F. Supp. 128, 133 (S.D. Iowa 1989) ("videotapes of events," including a public fist fight); *Channel 10, Inc. v. Gunnarson*, 337 F. Supp. 634, 638 (D. Minn. 1972) (the First Amendment protects the "right to be in public places and on public property to gather information, photographically or otherwise"). *See also Tarus v. Borough of Pine Hill*, 916 A.2d 1036, 1039 (N.J. 2007) ("public watchdog" had right to videotape council meeting); *Csorny v. Shoreham-Wading River Cent. Sch. Dist.*, 305 A.D.2d 83, 89 (N.Y. App. Div. 2003) (parents had right to videotape school board meeting); *Maurice River Twp. Bd. of Educ. v. Maurice River Twp. Teachers Ass'n*, 475 A.2d 59, 60 (N.J. Super. Ct. App. Div. 1984) (union had right to videotape school board meetings).[5]

The First Amendment protects the right to record public officials doing their jobs in public places, including police, in part because their actions are newsworthy and the recordings promote accountability. While most officers act lawfully, some do not. Often, the only evidence of what actually occurred will be conflicting testimony of officers and civilians. As a result, two-thirds of the sworn civilian allegations of police misconduct investigated by the City of Chicago last year could not be proven or disproven.[6] Audio recordings often provide critical information not available in photographs or silent videos: first, some police misconduct is purely verbal, such as threats and epithets; and second, the propriety of force frequently cannot be understood without knowledge of the spoken words preceding that force. *See, e.g., Scott v. Harris*, 550 U.S. 372, 391 & n.4 (2007) (Stevens, J., dissenting) (in a dispute over a high speed

---

[5] *Cf. Gilles v. Davis*, 427 F.3d 197, 212 n.14 (3rd Cir. 2005) ("videotaping or photographing the police in the performance of their duties on public property may be a protected activity"); *Iacobucci v. Boulter*, 193 F.3d 14 (1st Cir. 1999) (police violated the Fourth Amendment by arresting a person for audio/video recording a government meeting); *Williamson v. Mills*, 65 F.3d 155 (11th Cir. 1995) (police violated the Fourth Amendment by arresting a person for photographing an undercover officer at a festival).

[6] Specifically, for the 12 months ending in September 2009, Chicago's Independent Police Review Authority closed 1,013 investigations in which civilians signed affidavits. IPRA found that 68% of these complaints were "not sustained," meaning there was "insufficient evidence to either prove or disprove the allegation." Ex. D, at p. 29, & App. A at p. iii.

car chase, opining that the audio recording of the police car's siren tended to show that other motorists, in response to the siren, had pulled to the side of the road and out of danger); Jim Dwyer, *A Switch Is Flipped, and Justice Listens In*, N.Y. Times, Dec. 8, 2007 (discussing the use of civilian audio to impeach a detective's account of an interrogation).

> As the district court explained in *Robinson v. Fetterman*,
>
> The activities of the police, like those of other public officials, are subject to public scrutiny. . . .  Although Robinson need not assert any particular reason for videotaping the troopers, he was doing so in order to make a visual record of what he believed was the unsafe manner in which they were performing their duties. . . .  Videotaping is a legitimate means of gathering information for public dissemination and can often provide cogent evidence, as it did in this case.  In sum, there can be no doubt that the free speech clause of the Constitution protected Robinson as he videotaped the defendants.

378 F. Supp. 2d 534, 541 (E.D. Pa. 2005).  *See also Jean v. Massachusetts State Police*, 492 F.3d 24, 30 (1st Cir. 2007) (protecting the broadcast of a video/audio recording illegally created by another person, because "the event depicted on the recording – a warrantless and potentially unlawful search of a private residence – is a matter of public concern"); *Blackston v. Alabama*, 30 F.3d 117, 120 (11th Cir. 1994) (protecting the right to record a government meeting, because the ban "did have some impact on how they were able to obtain access to and present information about the Committee and its proceedings"); *Thompson v. City of Clio*, 765 F. Supp. 1066, 1070 (M.D. Ala. 1991) ("the ban on Thompson's tape recorder has some impact, however small or incidental, on how he is able to obtain access to and present such information, and as such regulates conduct protected by the first amendment").[7]  Such accountability concerns led Illinois to allow virtually all police recording of civilians.  *See supra* at 2-3.

---

[7] *See also* Seth F. Kreimer, *Pervasive Image Capture and the First Amendment: Memory, Discourse, and the Right to Record*, 159 U. Penn. L. Rev. __ (forthcoming) (copy attached as Ex. E); Howard M. Wasserman, *Orwell's vision: Video and the future of civil rights enforcement*, 68 Md. L. Rev. 600 (2009); Lisa Skehill, *Cloaking police misconduct in privacy: Why the Massachusetts anti-wiretapping statute should allow for the surreptitious recording of police officers*, 42 Suffolk U.L. Rev. 981 (2009).

**B.** **The Act, As Applied, Violates the First Amendment Right to Gather, Receive, and Record Information**

Strict scrutiny is the appropriate legal standard here.  As applied to the recording of police-civilian conversations, the Act comprises speaker-based discrimination.  As explained above, the right to speak and the right to record are flip sides of the same coin.  The Act allows the police to record virtually all police-civilian conversations, while prohibiting civilians from recording any.  Indeed, animosity to civilians recording police (but not police recording civilians) is the legislative purpose of the 1994 amendment extending the Act to non-private conversations.  *See supra* at 2.  Further, the Act does not limit the discretion of officers to decide which conversations to record.  Officers may choose to record conversations that cast them in a positive light, and to not record conversations that cast them in a negative light.  Officers may thereby control what information is conveyed to the public.  In addition, this same one-sided license to record as applied to police-civilian conversations comprises viewpoint discrimination, because it forbids civilians (but not officers) from creating an audio record for later use to advance their viewpoint of what occurred.  There is no principled basis for this twofold discrimination, much less a constitutional one.

Speaker-based discrimination is repugnant to both the Free Speech Clause of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment.  *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972) ("the equal protection claim in this case is closely intertwined with First Amendment interests").  "[S]peaker-based laws demand strict scrutiny when they reflect the Government's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say)."  *Turner Broad., Inc. v. FCC*, 512 U.S. 622, 658 (1994).  *See also Citizens United v. FEC*, 130 S. Ct. 876, 898-99 (2010) (the First Amendment prohibits "restrictions distinguishing among different speakers").

Likewise, viewpoint discrimination triggers strict scrutiny.  *See Entm't Software Ass'n. v. Blagojevich*, 469 F.3d 641, 646 (7th Cir. 2006) (holding that content-based speech restrictions

are subject to strict scrutiny); *Rosenberger v. University of Virginia*, 515 U.S. 819, 828, 837 (1995) ("Viewpoint discrimination is thus an egregious form of content discrimination.").

Additional factors making strict scrutiny appropriate here are (1) the Act flatly bans the audio component of the ACLU Program, (2) it does so in all public places, whether or not they are public forums, and (3) it does so on threat of criminal penalty.

First Amendment strict judicial scrutiny "requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Citizens United*, 130 S. Ct. at 898. Under strict scrutiny, a speech restriction is not narrowly tailored if "a less restrictive alternative would serve the Government's purpose." *Entm't Software Ass'n.*, 469 F.3d at 646. Here, the State cannot satisfy this standard. First, the government has no interest, let alone a compelling interest, in prohibiting civilians from audio recording conversations of police officers performing their public duties in public places – conversations for which the officers have no reasonable expectation of privacy. Second, the Act's means (prohibiting the recording of all conversations, including non-private conversations between police and civilians) is not the least restrictive means to achieve a compelling government interest (whatever it may be). The absence of a proper fit is further demonstrated by the Act's law enforcement exemptions. *See Mosley*, 408 U.S. at 99-100 (where an ordinance exempted "peaceful labor picketing" from a ban on picketing at schools, the city "may not maintain that other picketing disrupts the school unless the picketing is clearly more disruptive"); *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 638 (1980) (while the state asserts an interest in residential privacy, residents are "equally disturbed by solicitation" by the favored and disfavored solicitors).

Even if mid-level scrutiny is employed, the Act's application to the ACLU Program cannot pass muster. The government must prove that such speech restraints "are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

Under mid-level scrutiny, a speech restriction is not narrowly tailored unless it "promotes a substantial government interest that would be achieved less effectively absent the regulation." *Id.* at 799. This test is rigorous. *See, e.g., Turner Broad.*, 512 U.S. at 664 (government "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way"); *Edenfield v. Fane*, 507 U.S. 761, 777 (1993) ("Broad prophylactic rules in the area of free expression are suspect."). Just as the Act's application to the ACLU Program cannot satisfy strict scrutiny because it is not the least restrictive means to serve a compelling government interest, it cannot satisfy mid-level scrutiny because it is not narrowly tailored to serve a significant government interest. Moreover, the Act's application to the ACLU Program does not leave open adequate alternative channels of communication: as explained above, audio recordings of police provide critical information that often is not available from testimony, photographs, and silent video.[8]

### C.      Police Officers Acting in Public Have No Right to Privacy

There is no countervailing interest in police privacy. Thus, government may not condition plaintiff's exercise of First Amendment rights on obtaining police consent.

A right to privacy requires a subjective expectation of privacy that "society is prepared to recognize as reasonable." *Smith v. Maryland*, 442 U.S. 735, 740 (1979), *quoting Katz v. U.S.*, 389 U.S. 347, 361 (1967). Police performing their public duties in public places and speaking at an ordinary volume simply have no reasonable expectation of privacy. First, any right to privacy is significantly limited in public places. *See Berkemer v. McCarty*, 468 U.S. 420, 438 (1984) (there is no right to privacy during a "typical traffic stop [which] is public, at least to some degree. Passersby, on foot or in other cars, witness the interaction of officer and motorist.");

---

[8] Not to the contrary is *Potts v. City of Lafayette*, 121 F.3d 1106 (7th Cir. 1997), which upheld a ban on bringing items that could be used as weapons, including tape recorders, into a KKK rally, with a media exemption. This case is doubly distinct. First, in *Potts*, "personal items, such as a reporter's tape recorder, had been used to injure attendees" at prior KKK rallies. *Id.* at 1109. Here, there is no similar safety concern. Second, the government in *Potts* sought to stop tape recorders from being used as weapons, while the government here seeks to stop them from being used to gather information.

*Hornberger v. ABC, Inc.*, 799 A.2d 566, 623 (N.J. 2002) (the public setting of a traffic stop – "on the shoulder of a busy public highway" – showed the conversation was not private).

Second, police activity is and should be subject to robust public scrutiny.  In *Cassidy v. ABC, Inc.*, 377 N.E.2d 126, 132 (Ill. App. Ct. 1978), the Illinois Appellate Court found that an officer failed to state a claim for common law invasion of privacy, by alleging that a TV station secretly recorded him while making an undercover solicitation bust.  The court reasoned:

> [P]laintiff was not a private citizen engaged in conduct which pertained only to himself.  He was a public official performing a laudable public service and discharging a public duty.  In our opinion, under these circumstances no right of privacy against intrusion can be said to exist with reference to the gathering and dissemination of news concerning discharge of public duties.

*Id.* at 131-32.  *See also id.* at 132 ("the conduct of a policeman on duty is legitimately and necessarily an area upon which public interest may and should be focused").  *See generally F.O.P., Lodge No. 5 v. City of Philadelphia*, 812 F.2d 105, 120 (3d Cir. 1987) (given the sensitive nature of their work, police have a diminished expectation of privacy compared to members of the general public).  Indeed, the Act itself demonstrates that police have no reasonable expectation of privacy while conducting their duties in public, because the Act contains numerous exemptions to permit recording of the officers' conversations.

Further, courts have regularly held in interpreting eavesdropping statutes that there is no reasonable expectation of privacy during conversations between police and civilians, for both the police and the civilians.  *See Angel v. Williams*, 12 F.3d 786, 790 (8th Cir. 1993) ("[I]t was not objectively reasonable for the [police] officers to expect that their conversations would not be intercepted"); *F.O.P. v. Leggett*, 2008 WL 5678711 (Md. Cir. Ct. Oct. 20, 2008) ("there is no reasonable expectation of privacy in a patrol car or in conversations with police officers"); *Lewis v. State*, 139 P.3d 1078, 1080 (Wash. 2006) ("conversations between traffic stop detainees and police officers are not private conversations"); *Hornberger*, 799 A.2d at 593-594 (a TV station's secret recording of police conversations while searching a car did not violate the New Jersey eavesdropping statute, because the officers' "expectation of privacy is restricted because of their

status as police officers"); *People v. A.W.*, 982 P.2d 842, 847 (Colo. 1999) ("one who is speaking in the actual presence of a police officer or detective has neither a subjectively nor an objectively reasonable expectation of privacy"); *State v. Flora*, 845 P.2d 1355, 1357-1358 (Wash. App. 1992) (an arrestee who recorded his conversation with police did not violate Washington's eavesdropping statute, because the officers were "performing an official function on a public thoroughfare in the presence of a third party and within the sight and hearing of passersby").

## II.     THE ACLU IS SUFFERING IRREPARABLE HARM, AND THUS THERE IS NO ADEQUATE REMEDY AT LAW

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). *See also Nat'l People's Action v. Vill. of Wilmette*, 914 F.2d 1008 (7th Cir. 1990). The fact that the ACLU has not undertaken certain activities "due to fear of prosecution" is "sufficient to demonstrate irreparable injury." *Brownsburg Area Patrons Affecting Change v. Baldwin*, 137 F.3d 503, 507 (7th Cir. 1998). Further, a later damages remedy would not cure the infringement of the ACLU's First Amendment freedoms. *See id.*; *Nat'l People's Action*, 914 F.2d at 1013; *Grossbaum v. Indianapolis-Marion County Bldg. Auth.*, 63 F.3d 581, 585 (7th Cir. 1995).

## III.     THE BALANCE OF HARDSHIPS FAVORS A PRELIMINARY INJUNCTION

The irreparable harm that the ACLU will suffer if the preliminary injunction is not granted is far greater than the harm that defendant will suffer if the preliminary injunction is granted. As set forth above, there is a substantial First Amendment right at issue. Further, the Act, and its past enforcement by defendant and other State's Attorneys, is chilling the ACLU, precluding it from carrying out the planned ACLU Program. Connell Decl., ¶¶ 11-14.

On the other hand, the ACLU Program will not have any negative impact on the actions of the police, because the Act's exemptions already allow the audio recording of many law enforcement activities by the police themselves. *See, e.g., Ayres v. City of Chicago*, 966 F. Supp. 701, 717 (N.D. Ill. 1997) ("Preventing Plaintiff from engaging in her First Amendment protected activities creates a greater harm to Plaintiff than it does to the City, which has seen its festivals

thrive even with Plaintiff's presence in Grant Park over the past ten years."). Likewise, there is a substantial benefit to both police and civilians from recording police-civilian conversations: it will provide evidence of police misconduct, and thwart false accusations where police act appropriately.

## IV. A PRELIMINARY INJUNCTION SERVES THE PUBLIC INTEREST

"The public interest is clearly served by strong and vigorous protection of the First Amendment." *Ayres*, 966 F. Supp. at 717. *See also O'Brien v. Town of Caledonia*, 748 F.2d 403, 408 (7th Cir. 1984); *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.*, 163 F.3d 341, 363-64 (6th Cir. 1998).

## CONCLUSION

For the foregoing reasons, plaintiff respectfully requests that the Court preliminarily enjoin defendant from prosecuting plaintiff and its officers, board members, employees, agents, and volunteers under the Act for audio recording police officers, without the consent of the officers, when: (1) the officers are performing their public duties; (2) the officers are in public places; (3) the officers are speaking at a volume audible to the unassisted human ear; and (4) the manner of recording is otherwise lawful.

DATED:  September 3, 2010

Respectfully submitted:

s/ Richard J. O'Brien

_____
Counsel for plaintiff

| | |
|---|---|
| HARVEY GROSSMAN | RICHARD J. O'BRIEN |
| ADAM SCHWARTZ | LINDA R. FRIEDLIEB |
| KAREN SHELEY | MATTHEW D. TAKSIN |
| Roger Baldwin Foundation of ACLU, Inc. | Sidley Austin LLP |
| 180 N. Michigan Ave. Suite 2300 | One South Dearborn |
| Chicago, IL 60601 | Chicago, IL 60603 |
| (312) 201-9740 | (312) 853-7000 |